**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| BOROUGH OF NATIONAL PARK | : | |
| | : | |
| Plaintiffs | : | Civil Action No.: |
| | : | |
| v. | : | |
| | : | |
| SOLVAY SPECIALTY POLYMERS, | : | JURY TRIAL DEMANDED |
| USA, LLC; SOLVAY SOLEXIS, INC.; | : | |
| ARKEMA, INC.; ABC | : | |
| CORPORATIONS #1-10; and DOE | | |
| DISCHARGERS #1-10, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff, Borough of National Park files this Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.  The Plaintiff brings this civil action pursuant to the Spill Compensation and Control Act (the  "Spill Act"), N.J.S.A 58:10-23.11 to -23.24 and the common law of New Jersey for cleanup and removal costs, damages and other relief as a result of discharges and emissions of hazardous substances and pollutants, including but not limited to PFNA and PFOA, by defendants Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc., and Arkema, Inc.,  current and former owners and operators of a site located at 10 Leonard Lane in West Deptford Township (formerly Thorofare), Gloucester County, New Jersey. ("Solvay site").

2.  Such costs and damages include but are not limited to the past and future direct and indirect costs to develop and install a remedial alternative to address New Jersey

Maximum Contaminate Level (MCL) exceedance of perfluorononanoic acid (PFNA) in the groundwater that serves as the primary water supply source for the Borough of National Park.

## PARTIES

3.  Plaintiff, Borough of National Park is a borough governed under the Borough form of New Jersey municipal government with offices located at 7 South Grove Avenue, National Park, Gloucester County, New Jersey, 08063. (the "borough")

4.  Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas. As a limited liability company Solvay USA's citizenship is determined by the citizenship of each of its members. See, e.g., Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010). Upon information and belief based upon a search of publicly available sources, Solvay USA's sole member is Ausimont Industries Inc. ("Ausimont"), a Delaware corporation. Ausimont is a holding company with no operations. Its headquarters, president, and one of its board members are based in Houston, Texas. Accordingly, Ausimont's principal place of business if Houston, Texas. See, e.g., Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010); Johnson v. Smithkline Beecham Corp., 724 F.3d 337, 347 (3d Cir. 2013). Thus, Ausimont is a citizen of Delaware and Texas. Solvay USA, in turn, is also a citizen of Delaware and Texas. Neither Solvay USA nor Ausimont are citizens of the same state as the Plaintiffs.

5.  Based upon representation of counsel, Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

6.  Defendants Solvay USA and Solvay Solexis will collectively be referred hereinafter as "Solvay".

7.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, PA 19103. Arkema, Inc. is the corporate successor of Atochem North America, Inc., Elf Atochem North America Inc. and Pennwalt Corporation.

8.  Defendants ABC Corporations #1-10 are fictitious entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter or which are otherwise liable for the causes of action set forth herein.

9.  Defendant Doe Dischargers #1-10 are fictious names for entities whose identities are presently unknown and who were responsible for discharged hazardous substances and pollutants into the groundwater and environment resulting in contamination to the Plaintiff's property and municipal well.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that none of the Plaintiffs are domiciled in the same state as any Defendant, and the amount in controversy exceeds $75,000.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

I.  **Poly- and perfluoroalkyl Substances ("PFAS")**

12. Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals manufactured

and used in the United States since the 1940s.

13. PFAS have fire-resistant properties and act as oil, grease, and water repellants.

14. They have been used to make numerous household products like Stainmaster®, Scotchgard®, Teflon®, Gore-Tex® and Tyvek®.

15. They have long been used in aqueous film-forming foam used to fight fires.

16. There are literally thousands of PFAS compounds including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS").

17. PFAS compounds constitute a substantial threat to human health and the environment.

18. PFNA and PFOA contamination in drinking water presents a serious threat to public health. Exposure to extremely low concentrations of PFNA and PFOA in drinking water results in increased concentrations in human blood serum that persists for years after exposure ends. PFNA persists in human blood serum even longer than PFOA.

19. Some PFAS are classified as carcinogenic.

20. Studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

21. PFAS compounds are extremely resistant to degradation and thus persist indefinitely in the environment.

22. PFAS compounds bioaccumulate resulting in the buildup of these toxins in living tissue.

23. People who consume these substances through drinking water and other means accumulate increasing concentrations of PFAS in their blood.

4

24. Defendants and their predecessors in interest have understood the toxic characteristics of PFAS for decades.

25. Regulatory agencies around the world are only just beginning to understand the true nature and dangers of these contaminants.

26. The New Jersey Department of Environmental Protection ("NJDEP") has and is continuing to expend tremendous resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

27. Replacement chemicals including but not limited to "GenX" have been substituted by Defendants in place of their PFAS chemicals.

28. These replacement chemicals are being touted as short-chain and having shorter half-lives.

29. However, these replacement chemicals may have similar toxicity.

30. These replacement chemicals do not break down in the environment and have also been detected in drinking water, groundwater and surface waters.

31. EPA has identified PFAS as "emerging contaminants," which are currently unregulated at the federal level.

32. In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

33. In 2016, EPA reduced its advisories for PFOA and PFOS to 70 ppt collectively total.

34. In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable

health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

35. NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 13 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

36. NJDEP added PFNA to the Spill Act's List of Hazardous Substances on January 16, 2018.

37. On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

38. On March 31, 2020, the NJDEP adopted a PFOA MCL of 14 ppt and a PFOA groundwater quality standard of 14 ppt.

39. NJDEP has added PFOA and PFOS to the List of Hazardous Substances.

40. NJDEP issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc. among others, "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")..." which encompass the air and water utilized by plaintiff. Attached hereto as Exhibit A is a true and correct copy of the NJDEP Directive.

41. NJDEP also filed a civil action against the Solvay and Arkema on November 10, 2020 as a result of the discharge of PFAS, specifically PFNA chemicals into the environment which has contaminated the "public drinking water near the site." GLO-L-001239-20.

II.   **Affected Water Supply of National Park**

42. The Borough is located on the northern tip of Gloucester County, New Jersey along the Delaware River, approximately six miles southwest of the City of Camden and across the

Delaware River from Philadelphia. The Borough is approximately one square mile in area bordered on the west by the Delaware River and on the north, south, and east by West Deptford Township. Dividing lines are Delaware Avenue on the north, Woodbury Creek and Hessian Run on the South, and Red Bank Avenue on the east.

43. The National Park Water Treatment Plant (Plant) (PWSID No. NJ0812001) is located at 7 South Grove Avenue, directly behind National Park Borough Hall and currently services approximately 3,200 residents.

44. The Borough currently relies on two (2) groundwater production wells (Well No. 5 and Well No. 6) to meet 85 percent (271,000 gallons per day[gpd]) of its total daily water demand of 321,000 gpd. The remaining 15 percent (50,000 gpd) is provided by New Jersey American Water Company via a 12-inch interconnection located on the Plant Site.

45. On February 27, 2020 and March 9, 2020 NJDEP issued Notices of Non-Compliance letters to the borough with respect to PFAS contamination in excess of the established MCLs pursuant to the Safe Water Drinking Act.

46. The NJDEP letters detail Running Annual Average (RAA) PFNA concentrations of 15.5 ng/L for the period of 10/01/2019 through. 12/31/2019 and 17 nanograms per liter (ng/L) for the period of 01/01/2020 through 03/31/2020.

47. In sum, recent sampling in 2019/2020 reveals levels from 13.6 ng/l to 21.4 ng/l.[1]

48. Per the NJDEP Notices, the Borough's Water Department is required to bring the water supply system into compliance no later than January 16, 2021.

49. In order to remediate the public water supply, the borough retained an engineering consultant to prepare a Feasibility Study Report (FS) to develop and assess remedial alternatives to address New Jersey Maximum Contaminant Level (MCL) exceedances of

---

[1] As referenced in this complaint, ng/l is used interchangeably with parts for trillion (ppt).

perfluorononanoic acid (PFNA) in groundwater that serves as the primary water supply source for the Borough of National Park.

50. The objective of the selected remedy is to protect current human health receptors from exposure to PFNA levels above the NJDEP MCL in groundwater used as a drinking water source. To achieve the stated objective, a preliminary remediation goal is to reduce concentrations of PFNA in drinking water to below the NJDEP MCL of 13 ng/L through treatment or provision of an alternative water supply, within the timeframe set forth in NJDEP's Notice of Non-Compliance letter issued to the National Park Water Department (NJDEP, 2020).

51. The borough has selected a Granular Activated Carbon (GAC) treatment technology to meet the above stated objective and is awaiting NJDEP approval of the specifications for the system in order to begin construction and installation.

52. The borough has or will expend $23,485.00 for the FS; $5578.00 for water testing; $1,499,000 for system installation and $76,000.00 for filters for operating the system. Annual operating and maintenance costs are estimated at $76,192.00.

53. At all times relevant herein, the borough has agreed to comply with the requirements of the NJDEP notice and reduce concentrations of PFNA in drinking water to meet the NJDEP standards.

III.   **The Solvay site and its operations**

54. The Solvay property comprises 243-acres at 10 Leonard Lane in West Deptford Township (formerly Thorofare), Gloucester County, New Jersey. (the "site").

55.  The Solvay facility is in an agricultural and industrial area bounded by a railroad line to the south.

56. Active manufacturing operations, referred to as the Main Plant Area, occupy approximately 34 acres of the property, with the remaining acreage utilized for agriculture or currently unused.

57. The Borough, which borders West Deptford, is approximately one square mile in area bordered on the west by the Delaware River and on the north, south, and east by West Deptford Township. Dividing lines are Delaware Avenue on the north, Woodbury Creek and Hessian Run on the South, and Red Bank Avenue on the east.

58. The Solvay site is also bordered on the west by the Delaware River and is located approximately one mile from National Park.

59. The Solvay property was used for agricultural purposes prior to 1970. In 1970, Pennwalt constructed a fluorocarbon manufacturing facility on the former farmland. In 1977, manufacturing ceased until a new manufacturing facility was constructed from 1983 to 1985.

60. The new manufacturing facility built by Arkema produced industrial plastics and coatings, Kynar® (a fluoropolymer), hydrochlorofluorocarbon ("HCFC") gases, and polyvinylidene fluoride ("PVDF"). Arkema also began using Surflon®, a chemical mixture comprised of PFNA, perfluoroundecanoic acid ("PFUnDA" or "PFUnA"), PFOA and other PFAS compounds, in its manufacturing processes in 1985.

61. In October 1990, Arkema sold the facility to Solvay which continued to use PFAS compounds since that time and continues to use PFAS compounds at the Site today.

62. Manufacturing processes, discharges, emissions, and waste disposal practices at and from the Site have caused widespread soil, sediment, groundwater, and surface water contamination both on and off-Site, including PFNA and PFOA.

63. From approximately 1990 to 2012, Solvay manufactured polyvinylidene fluoride ("PVDF"). During most of this time, Surflon S-111 was used in the manufacturing process of PVFD. Surflon S-111 is composed of 79% PFNA. Solvay's facility was considered to have the second highest capacity in the world for purposes of using Surflon S-111 to make PVDF.

64. As a result of Solvay's operations at the facility, it discharged massive amounts of the Surflon S-111 (primarily, PFNA) into the surrounding air and water.

65. Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at its facility. The NaPf/o (which is a salt of PFOA) was supplied to Solvay by 3M. NaPFO degrades into PFOA. The site and surrounding area are also contaminated with PFOA as a result of Solvay's activities at the facility.

66. Currently, Solvay is using a replacement chemical for PFNA for use in the manufacture of its polyvinylidene product. This compound, identified in Wang, 2013, as "Solvay's product (CAS no. 329238-24-6) is a chloral perfluoro polyether carboxylate and has been identified in environmental matrices in Salem and Gloucester Counties.

67. According to an article published in Science 2020 some of these replacement products are likely ClPFPECA congeners and have been identified in the soils in areas surrounding Solvay, including area to the north and east, encompassing the Borough of national park.[2]

68. Solvay has reported using 275,730 lbs. of Surflon® at the Site between 1991 and 2010. According to Solvay, 86.6 percent of the Surflon® used at the Site between 1991 and 2010 was released into the environment through emissions to water and air, including 164,408 lbs. discharged to water and 73,632 lbs. emitted to the atmosphere.

---

[2] Washington et al., Science 368, 1103–1107 (2020) 5 June 2020, "Nontargeted mass-spectral detection of chloroperfluoropolyether carboxylates in New Jersey soils"

69. Solvay has reported using 23,241 lbs. of NaPFO at the Site between 1995 and 2003. According to Solvay, approximately 97 percent of the NaPFO used at the Site between 1995 and 2003 was released into the environment through emissions to water and air, including 20,682 lbs. discharged to water and 1,861 lbs. emitted to the atmosphere.

70. On-site and off-site groundwater sampling has revealed PFNA concentrations of up to 482,000 ppt and PFOA at concentrations of up to 16,2000 ppt. PFNA and PFOA were also detected in samples taken from off-Site monitoring wells. For example, Solvay detected PFNA at a concentration of 2,680 ppt at an off -Site well approximately 1.3 miles from the Site.

71. Quarterly sampling of several neighboring public water systems including West Deptford, East Greenwich, Greenwich and Paulsboro have PFNA concentrations, some as high as 150 ppt in Paulsboro and 120 ppt in Woodbury.

72. Private well sampling has identified twenty-five wells with PFNA contamination above 1500 ppt including residential well sampling approximately 2 miles east and southeast of the Site near Woodbury Creek which borders the Borough of National Park.

73. Samples of surface water, sediment and pore water from the Delaware river revealed detection of PFNA and PFUnDA in more than half of the sampled locations.

74. Testing of its effluent discharges to the Delaware river has revealed PFNA discharges as high as 14,000 ppt and concentrations of PFOA as high as 1,600 ppt.

IV.   **Groundwater Pathways**

75. The Borough of National Park and the Solvay Facility are underlain by a regional multilayered aquifer system that outcrops beneath both locales. This multilayered system is referred to as the Potomac-Raritan-Magothy (PRM) aquifer system. The uppermost

aquifer unit (Magothy Aquifer) directly underlies the Solvay Facility as well as the Borough of National Park.

76. According to the NJDEP, the Department identified multiple lines of evidence showing that PFAS discharges from the Site to the Delaware River between 1985 and 2010 caused widespread groundwater contamination around and distant from the Site. Due to the tidal nature of the Delaware River and the fact that the Delaware River recharges the PRM aquifer, PFAS discharged at the Site likely migrated both down river and up river into nearby tributaries, moved horizontally and downward through leaky confining units into the deeper aquifer system, and contaminated groundwater at locations not directly downgradient of the Site, including at locations proximal to the Delaware River and tidally influenced tributaries.

77. The three aquifer units (upper - Magothy, middle - Raritan, and lower - Potomac) comprise a hydraulically interconnected system where leakage occurs between the aquifer units and allows for contaminant migration between units. This hydraulic interconnectivity has been extensively documented by the United States Geologic Survey (USGS) and others.

78. Groundwater sampling data for Solvay monitoring wells has shown PFNA and PFOA concentrations in shallow and deeper monitoring wells on and proximate to their facility with concentrations over 1,000 ng/l or ppt in some of the deeper wells. The presence of these PFAs at depth at and proximate to the Solvay Facility is a consequence of and demonstrates the interconnection between aquifer units in the PRM aquifer system.

79. The Borough of National Park production wells are completed in the lower aquifer unit of the PRM system approximately 11,000 feet east-northeast of the Solvay Facility. Several

Municipal and industrial pumping centers to the east-northeast of the Solvay Facility exert an influence on groundwater flow in the region.  This influence has resulted in an east-northeast groundwater flow component in the lower aquifer from Solvay toward the Borough of National Park production wells.  USGS potentiometric surface mapping demonstrates this groundwater flow pathway for contaminant migration.

80. Therefore, the PFNA (up to 21.4 ng/l or ppt) and PFOA (up to 5.8 ppt) that have been detected in the Borough's production well drinking water samples are attributable to the Solvay Facility.

## V.  **Surface Water Pathways**

81. The PRM aquifer system outcrops extensively along the Delaware River proximate to the Solvay Facility and Borough of National Park.  The Delaware River and its tributaries have been and continue to be a source of recharge to the PRM aquifer system in New Jersey due to the lowering of groundwater levels as a result of the extensive groundwater pumping for municipal and industrial use over the past several decades.

82. There is extensive documentation in the literature (USGS and New Jersey Geologic Survey (NJGS)) regarding this interconnection between the Delaware River and its tributaries with the underlying PRM aquifer system.

83. The Solvay Facility has discharged very high levels of PFNA and PFOA to the Delaware River.  The sampling of the Delaware River and its tributaries proximate to the Solvay Facility has demonstrated levels of PFNA at 265 ppt and PFOA at 11.5 ppt (Maybury, Stephen, NJDEP May 2017).

84. This contamination has spread into upstream reaches of the river and its tributaries due to the tidal nature of the Delaware River and its tributaries.

13

85. High PFNA levels have reportedly been detected in Woodbury Creek which forms the southwestern boundary of the Borough of National Park.

86. According to NJDEP, it collected surface water samples from eleven waterways across the State. The highest levels of PFNA in any of the samples were found in Woodbury Creek, near the Solvay Site.

87. Therefore, this interconnection between the Delaware River and its tributaries with the PRM aquifer system provides a direct pathway for contaminant migration from surface water to groundwater and toward the Borough of National Park wells which are proximate to Woodbury Creek and the Delaware River.

88. While other sources of PFAS chemicals in general have been identified throughout and across the state, PFNA would not be expected to be the dominant PFAS contaminant associated with other industries. According to NJDEP, there is no more concentrated finding of PFNA in the State as exists at and around the Solvay Site.

89. As noted by NJDEP, PFNA in New Jersey has been detected as the primary PFAS compound in public supply wells in the two counties in the vicinity of the Solvay Site: Gloucester County – the County in which the Site is located – and the neighboring Camden County located to the northeast of National Park. PFNA has also been detected as a primary contaminant in private wells in Gloucester County.

90. As set forth above PFNA is the predominate chemical in the sampling of the Borough's public water supply in excess of the MCL resulting in Notices of Non-Compliance letters issued by NJDEP.

91. Accordingly, multiple pathways establish that PFAS chemicals discharged at and from the Solvay site into surface waters migrated into nearby tributaries, their sediments and

then into groundwater distant from the site, including the wells providing public water supply to the residents of National Park.

## **Count I: Spill Act**

92. Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

93. Defendant Solvay USA is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

94. Defendant Solvay Solexis is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

95. Defendant Arkema is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

96. Defendants ABC Corporations #1-10 are "persons" within the meaning of N.J.S.A. § 58:10-23.11b.

97. Defendant Doe Dischargers #1-10 are "persons" within the meaning of N.J.S.A. § 58:10-23.11b.

98. The discharge of hazardous substances is prohibited pursuant to N.J.S.A. § 58:10-23.11c.

99. The contaminants discharged from the Solvay Site are hazardous substances as defined in N.J.S.A. § 58:10-23.11b including but not limited to PFNA and PFOA.

100. A person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. § 58:10-23.11g.

101. Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.  N.J.S.A. § 58:10-23.11f(a)(2)(a).

102.  Plaintiff has incurred, and will continue to incur, costs and damages associated with the discharges of the aforementioned sites and which are "cleanup and removal costs" within the meaning of N.J.S.A. § 58:10-23.11b including but not limited to restoration of a clean water supply and/or providing access to an alternate water source.

103.  Defendant Solvay USA as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiff has incurred or will incur as a result of hazardous substances at their facility.

104.  Defendant Solvay Solexis as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiff has incurred or will incur as a result of hazardous substances at their facility.

105.  Defendant Arkema as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiff has incurred or will incur as a result of hazardous substances at their facility.

106.  Further, in accordance with N.J.S.A. § 58:10-23.11f plaintiff provided defendants 30 days' notice of plaintiff's intention to seek treble damages pursuant to this section and gave the defendants an opportunity to participate in the costs to clean up the borough's public water supply.

107.  Plaintiff has commenced remediation of the water supplied by its municipal well and has provided written notice to NJDEP that it intends to remediate its public water supply to meet NJDEP standards.

108. Accordingly, by not complying with plaintiff's notice requesting that defendants participate in the cleanup, defendants are strictly liable in an amount up to three times the cleanup and removal costs and  damages plaintiff has incurred or will incur as a result of the discharge of hazardous  substances at the Site. N.J.S.A. § 58:10-23.11f.

109. Defendants ABC Corporations #1-10 whose identities are unknown and who manufactured and/or supplied and/or discharged hazardous substance products, including PFAS chemicals are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiff has incurred or will incur as a result of their hazardous substances at their facility and/or hazardous substance products discharged into the environment.

110. Defendants Doe Dischargers #1-10 whose identities are unknown and who manufactured and/or supplied and/or discharged hazardous substance products, including PFAS chemicals are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiff has incurred or will incur as a result of their hazardous substances at their facility and/or hazardous substance products discharged into the environment.

111. As a direct or indirect result of the violations set forth above, Plaintiff has incurred and will incur in the future substantial costs related to the restoration of a clean water supply and/or access to an alternate water source.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages, including treble damages, compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along

with counsel fees and costs.

## Count II
### (Public Nuisance)

112. Plaintiffs repeat each allegation of Paragraphs 1 through 111 above as though fully set forth in its entirety herein.

113. Defendants acts and omissions with respect to the release of hazardous and toxic chemicals has unreasonably interfered with rights common to the general public including the public health, safety, peace, comfort, convenience and the public right to clean water, causing annoyance, inconvenience and distress to an indefinite number of persons, constituting a continuing public nuisance.

114. Defendants acts and omissions causing a continuing public nuisance have unreasonably interfered with rights peculiar to and common to plaintiff causing special damage to the plaintiff, including but not limited to, invading plaintiff's municipal well causing the water plaintiff is required to supply to its residents to become contaminated with PFAS contamination in excess of the established MCLs pursuant to the Safe Water Drinking Act.

115. Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the plaintiffs' right to a clean water supply from a common natural resource.

116. As a direct and proximate result of defendants' creations of a past and continuing public nuisance, plaintiff and the public have suffered and will continue to suffer damages, including but not limited to interference with the use of its municipal well, the loss of a clean water supply and costs to remediate the contamination from its water supply.

117. Plaintiffs have standing to seek appropriate relief to abate this public nuisance and require defendants to implement all reasonable measures to eliminate and/or mitigate this continuing public nuisance and reimburse plaintiff for compensatory damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along with counsel fees and costs.

## Count III
## (Private Nuisance)

118. Plaintiffs repeat each allegation of Paragraphs 1 through 117 above as though fully set forth in its entirety herein.

119. Groundwater is natural resource available to the general public and to property owners for the purpose of providing potable water among other uses.

120. Plaintiff has a right to the use and existence of uncontaminated groundwater for its use in supplying residents of the Borough a clean and safe water supply.

121. Defendants' acts and omissions with respect to the release of hazardous chemicals into the groundwater has unreasonably interfered with plaintiff's use of its municipal property causing it to expend large sums of money to remediate the condition caused by defendants' conduct.

122. Defendants' unreasonable interference with the use of plaintiffs' property constitutes a continuing private nuisance.

123. The defendants' conduct was unreasonable and otherwise actionable under the rules controlling liability for negligent conduct.

124. Defendants were under a duty to take positive action to prevent or abate the interference with plaintiffs' properties.

125. Defendants breached these duties.

126. The real property owned and occupied and used by plaintiff has become contaminated by the defendants.

127. Defendants are liable for the creation, and continued maintenance, of a private nuisance in contravention of the plaintiffs' right to a clean water supply from a common natural resource.

128. As a direct and proximate result of defendants' creations of a past and continuing private nuisance, plaintiff has suffered and will continue to suffer damages, including but not limited to interference with the use of its municipal well, the loss of a clean water supply and costs to remediate the contamination from its water supply.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along with counsel fees and costs.

## Count IV
### (Negligence)

129. Plaintiffs repeat each allegation of Paragraphs 1 through 128 above as though fully set forth in its entirety herein.

130. Defendants had a duty to plaintiff to ensure that hazardous substances and pollutants, including PFNA and PFOA were not discharged from its Site and did not injure the

groundwater, surface waters, sediments or air such that it would migrate from the Site to plaintiff's property and well.

131. Doe Defendant dischargers (#1-10) and Defendants ABC Corporations #1-10  had a duty to plaintiff to ensure that hazardous substances and pollutants were not discharged from their sites and did not injure the groundwater, surface waters or sediments such that it would migrate from its sites to plaintiffs' properties.

132. Defendants were negligent and careless and breached these duties.

133. As a direct and proximate result of defendants' negligence, plaintiff has suffered and will continue to suffer damages, including but not limited to interference with the use of its municipal well, the loss of a clean water supply and costs to remediate the contamination from its water supply.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along with counsel fees and costs.

### Count V
### (Trespass)

134. Plaintiffs repeat each allegation of Paragraphs 1 through 133 above as though fully set forth in its entirety herein.

135. Defendants' intentional acts and/or omissions have resulted and/or continue to result in the unlawful release of hazardous and toxic chemicals into plaintiff's property.

136. The hazardous chemicals present on plaintiff's property came from defendants'

properties and facilities.

137. Plaintiff has never consented to the invasion and presence of the discharged hazardous chemicals on its property.

138. The presence of such hazardous chemicals in and on plaintiff's property constitutes a continuing trespass.

139. As a direct and proximate result of defendants' trespass, plaintiff and the public have suffered and will continue to suffer damages, including but not limited to interference with the use of its municipal well, the loss of a clean water supply and costs to remediate the contamination from its water supply.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along with counsel fees and costs.

## Count VI
### (Abnormally Dangerous Activity)

140. Plaintiffs repeat each allegation of Paragraphs 1 through 139 above as though fully set forth in its entirety herein.

141. At all times relevant herein, defendants disposed of, discharged and emitted hazardous substances from their facilities which they owned, controlled and operated.

142. As a result of defendants discharging such substances from their sites, the groundwater, surface waters and sediments were contaminated with hazardous substances, creating a risk of harm to plaintiff as well as the surrounding community.

143. At all relevant times herein, Defendant Doe Dischargers (#1-10) and ABC Defendants

(#1-10) generated, disposed of, discharged and emitted hazardous substances from other sites owned and controlled by such defendants.

144. The generation, disposal and discharge of these products constitute ultrahazardous and/or abnormally dangerous activities that introduce an unusual danger into the community.

145. These activities have presented a high likelihood that the harm they would cause would be great. The generation, transportation, disposal and discharge are not matters of common usage in the areas where these activities were carried out and these activities were inappropriate to carry out in these locations.

146. At all relevant times herein, the risk of the defendants abnormally dangerous activities outweighed the value to the community.

147. Defendants acts and omissions in using, disposing, discharging, transporting and generating hazardous chemicals proximately caused the contamination to plaintiff's property.

148. Defendants are thus strictly liable for the harm these ultra-hazardous/abnormally dangerous activities which caused injury to the plaintiff.

149. As a direct and proximate result of defendants abnormally dangerous activities, plaintiff has suffered and will continue to suffer damages, including but not limited to interference with the use of its municipal well, the loss of a clean water supply and costs to remediate the contamination from its water supply.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for all damages compensable under the laws of this state, for the removal of the discharged hazardous substances and compelling Defendants to pay for the costs incurred by Plaintiff to supply its residents with a water supply free of hazardous contamination along with counsel fees

and costs.

**WILLIAMS CEDAR, LLC**

Dated:  April 19, 2021

*/s/ Alan H. Sklarsky*

Alan H. Sklarsky, Esquire

*/s/ Shauna L. Friedman*

Shauna L. Friedman, Esquire

## DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiffs hereby demand trial by jury on all issues set

forth herein.

**WILLIAMS CEDAR, LLC**

*/s/ Alan H. Sklarsky*

Alan H. Sklarsky, Esquire

*/s/ Shauna L. Friedman*

Shauna L. Friedman, Esquire

Dated: April 19, 2021

## <u>CERTIFICATION PURSUANT TO L. Civ. R. 11.2</u>

Undersigned counsel certifies that the following actions are pending involving the same

subject matter of this controversy:

1. <u>Giordano, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> –
   Civ. Action No. 1:19-cv-21573;

2. <u>Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> –
   Civ. Action No. 1:20-cv-6906;

3. <u>Bond, et al., v. Solvay Specialty Polymers, USA, LLC, et al.</u> –
   Civ. Action No.: 1:20-cv-8487;

4. <u>Slusser, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> –
   Civ. Action No.: 1:20-cv-11393

5. <u>Lombardo, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> –
   Civ. Action No.: 1:20-cv-15014

6. <u>Briggs, et al. v. Solvay Specialty Polymers, USA, LLC, et al</u> –
   Civ. Action No.: 1:21-cv-9699

7. <u>Lloyd, Justin v</u>. Solvay Specialty Polymers, USA, LLC, et al –
   Civ. Action No.: 1:21-cv-9705

8. <u>Britton, et al. v. Solvay Specialty Polymers, USA, LLC, et al</u> –
   Civ. Action No.: 1:21-cv-9707

9. <u>Gouse, et al. v. Solvay Specialty Polymers, USA, LLC, et al</u> –
   Civ. Action No.: 1:21-cv-9711

10. <u>Philipp, et al. v. Solvay Specialty Polymers, USA, LLC, et al</u> –
    Civ. Action No.: 1:21-cv-9714

Undersigned counsel further certifies that there are no additional known parties who

should be joined to the present action at this time.

I certify the foregoing to be true and I am aware that if any of the above is willfully false,

I am subject to punishment.

**WILLIAMS CEDAR, LLC**

*/s/ Alan H. Sklarsky*

Alan H. Sklarsky, Esquire

*/s/ Shauna L. Friedman*

Shauna L. Friedman, Esquire

Dated: April 19, 2021